**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**CHARLESTON DIVISION**

**ROBERT VARDELL FRANCIS,**

    **Plaintiff,**

**vs.**                       **CIVIL ACTION NO. 2:17-CV-01726**

**NANCY A. BERRYHILL,
ACTING COMMISSIONER OF
SOCIAL SECURITY,**

    **Defendant.**

## PROPOSED FINDINGS AND RECOMMENDATION

This is an action seeking review of the final decision of the Acting Commissioner of Social Security denying the Plaintiff's application for Disability Insurance Benefits (DIB) under Title II of the Social Security Act, 42 U.S.C. §§ 401-433. By Order entered October 20, 2017 (Document No. 11.), this case was referred to the undersigned United States Magistrate Judge to consider the pleadings and evidence, and to submit proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the Court is Plaintiff's Brief in Support of Motion for Judgment on the Pleadings and Defendant's Brief in Support of Defendant's Decision. (Document Nos. 9 and 10.)

Having fully considered the record and the arguments of the parties, the undersigned respectfully **RECOMMENDS** that the United States District Judge **DENY** Plaintiff's request for judgment on the pleadings (Document No. 9.), **GRANT** Defendant's request to affirm the decision of the Commissioner (Document No. 10.); **AFFIRM** the final decision of the Commissioner; and **DISMISS** this action from the docket of the Court.

## Procedural History

The Plaintiff, Robert Vardell Francis (hereinafter referred to as "Claimant"), protectively filed his application for Title II benefits on August 22, 2013 alleging disability since January 1, 2011[1], because of "degenerative bone loss in both knees, and cyst in right knee".[2] (Tr. at 191.) His claim was initially denied on October 25, 2013 (Tr. at 67-71.) and again upon reconsideration on December 11, 2013. (Tr. at 73-79.) Thereafter, Claimant filed a written request for hearing on January 31, 2014. (Tr. at 80-81.) An administrative hearing was held on September 9, 2015[3] before the Honorable Jon K. Johnson, Administrative Law Judge ("ALJ"). (Tr. at 23-39.) On October 7, 2015, the ALJ entered an unfavorable decision. (Tr. at 8-22.) On December 3, 2015, Claimant sought review by the Appeals Council of the ALJ's decision. (Tr. at 7.) The ALJ's decision became the final decision of the Commissioner on January 10, 2017 when the Appeals Council denied Claimant's Request. (Tr. at 1-6.)

On March 9, 2017, Claimant timely brought the present action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g). (Document No. 1.) The Commissioner filed an Answer and a Transcript of the Administrative Proceedings. (Document Nos. 5 and 6.) Subsequently, Claimant filed a Brief in Support of Motion for Judgment on the Pleadings (Document No. 9.), and in response, the Commissioner filed a Brief in Support of Defendant's Decision. (Document No. 10.) Consequently, this matter is fully briefed and ready for resolution.

**<u>Claimant's Background</u>**

Claimant was 58 years old as of the amended alleged onset date, and considered a "person

---

[1] Claimant amended his alleged onset date to February 12, 2013. (Tr. at 26.)
[2] In his second Disability Report – Appeal, submitted on January 31, 2014, Claimant alleged that the pain in his knees worsened and that he had more bone loss in them. (Tr. at 222.)
[3] The hearing was originally scheduled for May 21, 2015, however, it was continued to obtain additional medical records. (Tr. at 40-44.)

of advanced age" (Tr. at 45.), and was 61 at the time of the hearing and considered "closely approaching retirement age." See 20 C.F.R. § 404.1563(e). (Tr. at 32.) Claimant worked for over twenty years as an air traffic controller, initially in the high altitude route separating aircraft, and then in flight service where he did aviation weather, flight planning, and search and rescue, which was primarily a desk job. (Tr. at 29-30.)

**Standard**

Under 42 U.S.C. § 423(d)(5) and § 1382c(a)(3)(H)(i), a claimant for disability benefits has the burden of proving a disability. See Blalock v. Richardson, 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims. 20 C.F.R. § 404.1520. If an individual is found "not disabled" at any step, further inquiry is unnecessary. Id. § 404.1520(a). The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment. Id. § 404.1520(b). If the claimant is not, the second inquiry is whether claimant suffers from a severe impairment. Id. § 404.1520(c). If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4. Id. § 404.1520(d). If it does, the claimant is found disabled and awarded benefits. Id. If it does not, the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant work. Id. § 404.1520(f). By satisfying inquiry four, the claimant establishes a *prima facie* case of disability. Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981). The burden then shifts to the Commissioner, McLain v. Schweiker, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth

and final inquiry: whether the claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining physical and mental capacities and claimant's age, education and prior work experience. Id. § 404.1520(g). The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists in the national economy. McLamore v. Weinberger, 538 F.2d 572, 574 (4th Cir. 1976).

## Summary of ALJ's Decision

In this case, the ALJ determined that Claimant met the requirements for insured worker status through December 31, 2018. (Tr. at 13, Finding No. 1.) Moreover, the ALJ determined that Claimant satisfied the first inquiry because he had not engaged in substantial gainful activity since the amended alleged onset date of February 12, 2013. (Id., Finding No. 2.) Under the second inquiry, the ALJ found that Claimant had the following severe impairments: osteoarthritis of the right knee and degenerative disc disease. (Tr. at 14, Finding No. 3.) At the third inquiry, the ALJ concluded Claimant's impairments did not meet or equal the level of severity of any listing in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Id., Finding No. 4.) The ALJ then found that Claimant had the residual functional capacity ("RFC") to perform the full range of sedentary work. (Id., Finding No. 5.) At step four, the ALJ found Claimant was capable of performing his past relevant work as an air traffic controller. (Tr. at 17, Finding No. 6.) Finally, the ALJ determined Claimant had not been under a disability from February 12, 2013 through the date of the decision. (Id., Finding No. 11.)

## Claimant's Challenges to the Commissioner's Decision

Claimant asserts that the ALJ improperly evaluated his credibility be relying on the objective evidence, and selected portions of Claimant's testimony and Function Report, which he

had submitted in September 2013 when he was still working part-time at Lowe's and able to stand for a few hours. (Document No. 9 at 7-9.) Claimant testified that he quit working because it was hard for him to sit due to pain and stiffness. (Id. at 10.) Claimant testified that his condition worsened since he submitted his Function Report; his testimony regarding impairments does not support the ALJ's RFC. (Id.) Claimant further argues that the ALJ did not apply the factors required under the Regulations, did not cite what facts he relied on to discount Claimant's allegations, but discussed evidence that supported his decision, which rendered it unsupported by substantial evidence. (Id. at 10-12.)

Claimant testified that he had to change positions every fifteen to twenty minutes and that he could not do his prior job. (Id. at 12-13.) Additionally, the ALJ failed to consider Claimant's pain interfering with his concentration and the sedating side effects caused by his pain medication and muscle relaxers. (Id. at 13.) Claimant asks that the final decision be remanded to correct the errors below. (Id.)

In response, the Commissioner argues the ALJ complied with the Regulations and Fourth Circuit jurisprudence in assessing Claimant's credibility. (Document No. 10 at 14-15.) The Commissioner states that the ALJ provided a thorough analysis of the evidence of record as well as his rationale for his assessment that is supported by substantial evidence; further, no treating or examining physician indicated Claimant was disabled or that his limitations were greater than those in the RFC. (Id. at 15-16.) The ALJ's credibility finding is also supported by the opinion evidence, that Claimant could perform a limited range of light work, however, the ALJ considered both medical records as well as Claimant's own statements in limited him to sedentary work. (Id. at 17-18.)

Contrary to Claimant's assertions, the record did not support that he had to change his position every fifteen to twenty minutes and could no longer perform his past relevant work; Claimant indicated to his medical providers that he had experienced no limitations with respect to his ability to change his position. (Id. at 19.) With regard to his pain affecting his concentration, the Commissioner points out that the record shows that Claimant denied problems in his ability to concentrate, and there is no record other than his own statements that he experienced side effects from his medications. (Id.) Finally, the Commissioner points out that Claimant worked until October 2013, approximately eight months after he alleged that he became disabled, which does not undermine the ALJ's credibility finding, but actually supports his finding that Claimant was not entirely credible, and less limited than alleged. (Id. at 19-20.)

In sum, the Commissioner asks the Court to affirm the final decision. (Id. at 20.)

**The Relevant Evidence of Record**[4]

The undersigned has considered all evidence of record, including the medical evidence, pertaining to Claimant's arguments and discusses it below.

Claimant's Function Report:

On September 20, 2013, Claimant completed a Function Report in connection with his application for disability; at the time, Claimant was employed as a customer service associate at Lowe's. (Tr. at 198-205.) He alleged having constant pain, stiffness, and limited movement in both knees, with the right knee being worse. (Tr. at 198.) He stated he could not stand for more than a few hours or lift much. (Id.) When he got home from work, he needed to stay off his feet. (Tr. at

---

[4] The undersigned focuses on the relevant evidence of record pertaining to the issues on appeal as referenced by the parties in their respective pleadings.

199.) He alleged that his pain interfered with his sleep, and it took him longer to put on pants and shoes, and that sitting and standing was more difficult. (Id.)

Though he did not need reminders to take care of personal needs, he stated his wife reminds him to take his medicine. (Tr. at 200.) She also does the cooking. (Id.) He does "very limited" housework, mainly unloading the dishwasher. (Id.)

Claimant could drive, and went to work at Lowe's on a regular basis, but due to his physical impairments, his interests changed from doing physical activities to movies and reading. (Tr. at 202.) He avoided going places where he would have to walk or stand for any length of time. (Tr. at 203.) He estimated that he could lift no more than twenty pounds and walk and stand for a couple of hours at a time. (Id.) Claimant can pay attention "fairly well" and follow written and spoken instructions. (Id.) He can also handle stress and changes in routine well. (Tr. at 204.)

Claimant had a brace/splint that was not prescribed, but he used it when he knows he will be on his feet. (Id.) He takes hydrocodone that causes constipation, dizziness, and nausea, and Ambien makes him lethargic and nauseated. (Tr. at 205.) He is working less and less hours because of his knees, but he is afraid of having knee replacement surgery. (Tr. at 204, 205.)

<u>Orthopedic Medical Records:</u>

By way of background information, John J. McElroy, M.D., performed a right knee arthroscopy with partial medial meniscectomy and chrondroplasty in 2009. (Tr. at 271, 453.)

On June 26, 2013, Brook E. Morgan, PA-C, a physician's assistant, saw Claimant for complaints of right distal thigh pain, right knee pain, and instability. (Tr. at 271-272.) A Lachman test did not demonstrate instability of the knee, and a McMurray test was negative.[5] (Tr. at 271.)

---

[5] The Commissioner provided several footnotes to educate the Court on the various terms referenced in the medical records that the undersigned reproduces throughout this Proposed Findings and Recommendation: The Lachman test

X-rays of the right knee showed moderate to severe degenerative changes of the patellofemoral joint (one of the knee joints) with large spurs of the patella. (Id.) An MRI of the right knee confirmed degenerative changes of the patellofemoral joint and medial compartment; the study also showed no definite meniscus tears, a large effusion, and a Baker's cyst.[6] (Tr. at 271-272.) A corticosteroid injection into the right knee was administered. (Tr. at 272.) In July and August 2013, Claimant received three Euflexxa injections in his right knee.[7] (Tr. at 273-275.)

On September 23, 2013, Ms. Morgan saw Claimant for a recheck of his right knee pain. (Tr. at 451.) An examination revealed crepitus, tenderness upon palpation of the medical aspect and patellofemoral region, pain elicited by extension, no erythema, no warmth, no tenderness upon palpation of the lateral aspect or medial collateral ligament, no one plane medial (straight) instability, no one plane lateral (straight) instability, and full range of motion of the knee. (Id.) A Lachman test did not demonstrate anterior instability, and a McMurray test was negative. (Id.) X-rays taken that day revealed severe osteoarthritis of the patellofemoral joint. (Id.) Ms. Morgan discussed a total knee arthroplasty. (Tr. at 452.) Claimant stated that he was ready to schedule surgery because his knee pain kept him from doing anything he enjoyed. (Id.) He was scheduled for the surgery "in the future" with Dr. McElroy. (Id.)

On January 8, 2014, Dr. McElroy saw Claimant for a history and physical prior to total

---

is a maneuver to detect deficiency of the anterior cruciate ligament. The Free Medical Dictionary, Lachman Test http://medical-dictionary.thefreedictionary.com/Lachman+maneuver. (Document No. 10 at 3, fn.2.) The McMurray's test is used to detect a tear in the medial or lateral meniscus of the knee joint. Dorland's Illustrated Medical Dictionary 1808 (29th ed. 2000). (Id. at fn.3.)

[6] A Baker's cyst is caused when excess joint fluid is pushed into one of the sacs of tissue behind the knee. It is usually caused by rheumatoid or osteoarthritis. Often, a Baker's cyst causes no pain, and it may go away on its own. If it does not go away, or if is causing a lot of pain, a physician may drain it with a needle or give an injection of steroid medicine to reduce swelling. WebMD, Baker's Cyst – Topic Overview http://www.webmd.com/pain-management/tc/bakers-cyst-topic-overview. (Id. at fn.4.)

[7] Euflexxa "is used to treat knee pain in patients with joint inflammation (osteoarthritis)." WebMD, Euflexxa Syringe http://www.webmd.com/drugs/2/drug-94429/euflexxa-intra-articular/details. (Id. at 4, fn.5.)

knee arthroplasty, scheduled for January 21, 2014. (Tr. at 453.) Claimant complained of intermittent instability and knee joint pain in the lateral aspect, worse while standing. (Id.) There are no records indicating that Claimant followed through with the recommended surgery.

Treating Physician Records:

On February 12, 2013, William E. Cartwright, M.D. saw Claimant for complaints of arthritis, with his right knee worse than his left. (Tr. at 295.) Examination of the knee revealed crepitus with no generalized tenderness. (Tr. at 296.) Dr. Cartwright prescribed Mobic (a non-steroidal anti-inflammatory drug used to treat arthritis). (Id.) On June 3, 2013, Dr. Cartwright saw Claimant for follow up of right knee pain. (Tr. at 292.) Claimant told Dr. Cartwright that this condition occurred in association with a change in activity and that he "may have irritated [his knee] during recent actors' guild practices." (Id.) Claimant also told Dr. Cartwright that onset was sudden and occurred one week prior. (Id.) Claimant denied pain in other joints, back pain, and paresthesias or weakness in his extremities. (Id.) A physical examination revealed negative straight-leg raising tests on both the left and right, generalized swelling in the right knee with decreased range of motion, a positive McMurray's test, medial knee tenderness and crepitus, and no lateral knee tenderness or warmth. (Tr. at 293.) Dr. Cartwright recommended a knee MRI and x-rays. (Id.)

On August 21, 2013, Dr. Cartwright saw Claimant for complaints with his knee. (Tr. at 289.) Claimant reported that he was "feeling well" in general and denied back pain. (Id.) An examination of the right knee revealed decreased range of motion but no pain with movements. (Tr. at 290.) Dr. Cartwright referred Claimant to an orthopedic surgeon. (Id.)

On May 15, 2014, Dr. Cartwright saw Claimant for an annual wellness visit. (Tr. at 440.)

It was noted that Claimant came to the visit alone. (Tr. at 441.) He stated that he was "feeling great" other than trouble with allergies, and was "still exercising." (Tr. at 440.) He denied musculoskeletal and neurological symptoms. (Id.) A physical examination was entirely normal, including neurologic and musculoskeletal findings. (Tr. at 440-441.) Dr. Cartwright noted that Claimant lost weight through exercise. (Tr. at 441.)

On June 20, 2014, Dr. Cartwright saw Claimant for allergies. (Tr. at 438.) Claimant stated that he had a role in a live production all weekend and was concerned that his face would be swollen from hives. (Id.) A physical examination was otherwise normal. (Tr. at 439.) A musculoskeletal examination revealed no gross deformity. (Id.)

On September 18, 2014, Dr. Cartwright saw Claimant for complaints of sudden dizziness. (Tr. at 433.) Claimant denied weakness, syncope, or difficulty ambulating, and stated that he was "feeling well" in general. (Id.) He denied anxiety, impaired cognitive function, and memory loss. (Tr. at 434.) Physical examination findings were entirely normal; a neurologic examination revealed normal sensation and muscle strength in the both the left and right upper and lower extremities, and a musculoskeletal examination revealed no gross deformity or motor deficit. (Id.) The diagnosis was benign paroxysmal positional vertigo. (Tr. at 435.)

On October 28, 2014, Dr. Cartwright saw Claimant for complaints of sinus trouble. (Tr. at 430.) Claimant also complained that his knee hurt. (Id.) A physical examination was entirely normal, including normal joints and muscles. (Tr. at 431.)

On February 23, 2015, Dr. Cartwright saw Claimant for complaints of facial swelling/itching that began two days previously. (Tr. at 428.) A physical examination was normal except for mild allergic contact dermatitis. (Tr. at 428-429.)

On April 14, 2015, Dr. Cartwright saw Claimant for complaints of sudden right leg numbness and acute lumbar back pain (Tr. at 463.) A musculoskeletal examination revealed decreased range of motion, and paraspinous muscle spasm of the right lumbar area. (Tr. at 464.) A left straight-leg raising test was negative, a right straight-leg raising test was negative, and there was no tenderness over the thoracic paraspinous muscles, lumbar paraspinous muscles, thoracic vertebra, lumbar vertebra, or sacral vertebra. (Id.) The diagnosis was lumbar back pain with radiculopathy affecting right lower extremity. (Id.) Dr. Cartwright started Claimant on medication (prednisone and cyclobenzaprine) and recommended an MRI. (Id.)

On April 23, 2015, Dr. Cartwright saw Claimant for follow-up care. (Tr. at 461.) Claimant stated that he was "70% better" but still had some numbness and tingling in the right thigh. (Id.) A physical examination revealed improved symptoms, with some residual paresthesias following a recent steroid course. (Tr. at 462.) Dr. Cartwright encouraged Claimant to limit weight lifting to less than 20 pounds and avoid the use of machines that require bending/twisting at the waist when he returned to the gym. (Id.)

An April 29, 2015 MRI of the lumbar spine revealed focal degenerative changes particularly at L4-L5, spondylolisthesis, enlarged facets, and thickened ligamentum flavum resulting in severe canal and lateral recess stenosis. (Tr. at 424.) Dr. Cartwright reviewed the study later that day and on April 30, 2015, Dr. Cartwright saw Claimant to discuss the MRI results. (Tr. at 424, 460.) A physical examination revealed no decrease in range of motion or pain on movement, no deformities, negative left and right straight-leg raising tests, and no paraspinous muscle spasm. (Tr. at 460.) Dr. Cartwright referred Claimant to William Zerick, M.D., a neurosurgeon, and encouraged him to follow up with Dr. McElroy regarding the previously

scheduled right knee surgery. (Id.)

Veterans Administration ("VA") Records:

Progress notes from the VA cover the period from March 20, 2014 through April 2, 2015. (Tr. at 468-508.) In March 2014, Windell T. Chua, M.D. saw Claimant for the first time. (Tr. at 501.) A physical examination revealed that Claimant ambulated with a normal gait. (Id.) When asked if he used any assistive devices, he replied, "glasses." (Tr. at 507.) When screened with respect to activities of daily living, such as eating, bathing, grooming, dressing, toilet habits, walking, climbing or descending stairs, getting up from a chair or bed or using an assistive device, Claimant stated that there had been no changes in his ability to independently perform activities of daily living in the past 12 months. (Tr. at 506-507.) He denied any incidents of falling within the past 12 months. (Tr. at 507.) A musculoskeletal examination revealed no evidence of tenderness, and a neurological examination revealed that motor strength, sensation, and deep tendon reflexes were within normal limits. (Tr. at 501.) Claimant reported no limitation with respect to his ability to change and control body position. (Tr. at 507.) He was counseled on the importance of regular exercise and/or physical activity and was instructed to try to exercise at for least 30 minutes three times a week. (Tr. at 502.)

On July 21, 2014, Claimant presented as a walk in; he complained of foreign bodies (rose thorns) imbedded in his right ear. (Tr. at 497.) He denied any pain and had a pain score of zero. (Tr. at 498.)

On August 25, 2014, Dr. Windell saw Claimant for follow up of dyslipidemia and a Baker's cyst in his right knee. (Tr. at 493.) A physical examination revealed that range of motion of the right knee was within normal limits, and no evidence of motor or sensory deficits. (Id.)

Claimant reported no limitation with respect to his ability to change and control body position (Tr. at 495-496.) He also reported that he walked frequently. (Tr. at 496.) August 25, 2014 x-rays of the right knee revealed advanced patellofemoral articulation degenerative change and large prepatellar enthesophytes. (Tr. at 474.)

On April 2, 2015, Jan A. Pijanowski, M.D. saw Claimant for an osteoarthritis consult. (Tr. at 483.) Dr. Pijanowski noted that Claimant was hobbling and endorsed 4-5 pain on a 10-point scale. (Tr. at 486.) A review of systems was otherwise negative, and Claimant reported no acute complaints. (Id.) A physical examination revealed full range of motion in all four limbs. (Tr. at 487.) Dr. Pijanowski referred Claimant to orthopedics and started him on ibuprofen. (Id.) When screened with respect to activities of daily living, including the ability to get up from a chair or bed, Claimant stated that there had been no changes in his ability to independently perform his activities of daily living in the past 12 months. (Tr. at 490.) He denied any incidents of falling within the past 12 months or the need to use an assistive device; he reported no limitation with respect to his ability to change and control body position; and he acknowledged that he walked frequently. (Id.)

Neurosurgeon Records:

On May 12, 2015, Claimant completed a questionnaire prior to his appointment with Dr. Zerick on July 18, 2015. (Tr. at 510-515.) Claimant complained of numbness in his right leg and back pain that began "about a month ago." (Tr. at 510.) He specifically denied any problems in the past three years with his ability to concentrate. (Tr. at 514.)

On July 18, 2015, Dr. Zerick noted that Claimant had some pain and numbness in his right leg and back "that really has resolved." (Tr. at 516.) Claimant claimed that his pain was

exacerbated with sitting, standing, and walking, however, Dr. Zerick noted that he was "doing quite a bit better." (Id.) His biggest complaint was "some discomfort" in his left scapula (shoulder blade) and numbness and tingling into his left arm, "but no real pain." (Id.) An examination of the lower extremities showed no sensory or motor deficits, a bilateral straight-leg raising test produced no radicular pain, a Spurling's maneuver was positive on the left, and a motor exam of the upper extremities showed no focal motor weakness. (Id.) Dr. Zerick told Claimant to take a steroid dosepak even though his motor examination was normal, noted that he would obtain a cervical MRI if Claimant's condition worsened, and recommended follow up in 3-4 months. (Tr. at 517.)

State Agency Medical Consultants:

On October 23, 2013, Thomas Lauderman, D.O. performed a physical residual functional capacity assessment based on his review of the record. (Tr. at 49-50.) Dr. Lauderman found that Claimant could perform the exertional demands of light work as he could lift and/or carry 20 pounds occasionally and 10 pounds frequently, stand and/or walk for a total of about 6 hours in an 8-hour workday, sit for a total of about 6 hours in an 8-hour workday, and push and/or pull without limitation other than shown for lifting and/or carrying. (Tr. at 49.) Dr. Lauderman also found that Claimant could perform postural maneuvers occasionally, and that he would need to avoid concentrated exposure to vibration, and moderate exposure to extreme cold, extreme heat, and hazards such as machinery and heights. (Tr. at 49-50.)

On December 11, 2013, Uma Reddy, M.D. reviewed the updated record and affirmed Dr. Lauderman's findings. (Tr. at 59-60.)

**The Administrative Hearing**

Claimant Testimony:

Claimant testified that as an air traffic controller he had never worked in the tower. (Tr. at 30.) Claimant stated that he also worked part-time at Lowe's from 2007 until 2013 and left that job because he could hardly stand on his feet. (Tr. at 36.)

He admitted that he had driven himself to his hearing, but did not take his hydrocodone and muscle relaxers that morning because they caused him to be sleepy and drowsy. (Tr. at 31, 33). He stated that his wife worked outside the home and that they had no children or grandchildren living with them. (Tr. at 31.) He stated that he did the dishes, but his wife did all the other housework, and that he did not like to shop, and did not go shopping. (<u>Id</u>.) He testified that his grandson did their yard work. (<u>Id</u>.) Claimant described his average day as watching television and "that's about all I do now." (<u>Id</u>.) He stated that he had a computer, but he hated getting on it and only did so to pay bills. (Tr. at 31-32.) He stated that he used to be pretty active and his life had really changed. (Tr. at 32.)

Claimant testified that he could comfortably sit for fifteen to twenty minutes; he stated that after that time he would either turn to his other side or lay down. (<u>Id</u>.) He stated that he lay down quite a bit during each day in order to ease his pain. (Tr. at 32-33.) He stated that he took hydrocodone and muscle relaxers daily. (Tr. at 33.) As far as standing, he stated that his knee really started to ache badly if he stood very long and stated he could be on his feet about ten or fifteen minutes. (Tr. at 33-34.) He stated that he was up and down during that day due to his problems with sitting and standing. (Tr. at 34.)

Claimant testified that he had told his primary care physician that he was exercising and feeling great in May 2014 because he had been doing floor exercises and he was having a good day when he saw the doctor. (<u>Id</u>.) He stated that he "always tried to be upbeat with the doctor, but

I don't know. I guess I was denying – in denial with that." (Id.)

Claimant testified that he was involved in the local Actor's Guild to the extent that he took a role in one play that involved walking on at the end of a play, delivering four lines and then walking off; he stated that he sat or moved around backstage while waiting to play his part. (Tr. at 35.)

He acknowledged that he had been scheduled for a total knee replacement the previous year and stated that it was cancelled because he had a hydrocele that had to be taken care of first. (Id.) Claimant testified that he did not think he could return to doing the air traffic controller job because he would not be able to concentrate because of his pain. (Tr. at 36.) He also stated that he would not be able to sit and do the job now. (Id.)

Nancy Shapero, Vocational Expert ("VE") Testimony:

The VE testified that Claimant's past work as an air traffic controller was classified as light skilled work by the Dictionary of Occupational Titles ("DOT"), but that it was usually performed at the sedentary exertional level. (Tr. at 29.) She stated that the description of the job as light work "may be" because the DOT "has not been updated for so long." (Id.)

**Scope of Review**

The sole issue before this Court is whether the final decision of the Commissioner denying the claim is supported by substantial evidence. In Blalock v. Richardson, substantial evidence was defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'

Blalock v. Richardson, 483 F.2d 773, 776 (4th Cir. 1972) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966)). Additionally, the Commissioner, not the Court, is charged with resolving conflicts in the evidence, however, the Court determines if the final decision of the Commissioner is based upon an appropriate application of the law. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Further, the Courts "must not abdicate their traditional functions; they cannot escape their duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974). If substantial evidence exists, the Court must affirm the Commissioner's decision "even should the court disagree with such decision." Blalock, 483 F.2d at 775.

**Analysis**

The Pain and Credibility Assessment:

As mentioned previously, Claimant contends that the ALJ failed to consider all the evidence of record and to abide by the Regulatory factors when he assessed Claimant's credibility, resulting in a decision that is unsupported by the substantial evidence. It is well known that credibility determinations are properly within the province of the adjudicator and beyond the scope of judicial review. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990); Davis v. Colvin, 3:13-CV-23399, 2015 WL 5686896, at *7 (S.D.W. Va. Sept. 8, 2015) ("The credibility determinations of an administrative judge are virtually unreviewable on appeal.") Nevertheless, Social Security Ruling (SSR) 96-7p[8] provides clarification for adjudicators when evaluating a claimant's symptoms, including pain; 20 C.F.R. § 404.1529 requires a finding about the credibility of an individual's statements about pain or other symptom(s) and its functional effects; explains the

---

[8] The undersigned is mindful that this Ruling has been superseded by SSR 16-3p, however, the previous Ruling was in effect at the time of the ALJ's decision, October 7, 2015.

factors to be considered in assessing the credibility of the individual's statements about symptoms; and states the importance of explaining the reasons for the finding about the credibility of the individual's statements. 1996 WL 374186, at *1.

The Ruling further directs that factors in evaluating the credibility of an individual's statements about pain or other symptoms and about the effect the symptoms have on his or her ability to function must be based on a consideration of all of the evidence in the case record. This includes, but is not limited to: (1) the medical signs and laboratory findings; (2) diagnosis, prognosis, and other medical opinions provided by treating or examining physicians or psychologists and other medical sources; and (3) statements and reports from the individual and from treating or examining physicians or psychologists and other persons about the individual's medical history, treatment and response, prior work record and efforts to work, daily activities, and other information concerning the individual's symptoms and how the symptoms affect the individual's ability to work. Id. *passim*. In accordance with Section 404.1529, the Ruling provides seven factors that an ALJ must consider in addition to the objective medical evidence when assessing a claimant's credibility:

1. The individual's daily activities;

2. The location, duration, frequency, and intensity of the individual's pain or other symptoms;

3. Factors that precipitate and aggravate the symptoms;

4. The type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;

5. Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;

6. Any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g. lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and

7. Any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

Id., at *3.

In this case, the ALJ first discussed Claimant's allegations of degenerative bone loss of the knees and that he suffers from pain, stiffness and limited movement. (Tr. at 15, 190-197, 198-205.) The ALJ also acknowledged that Claimant claimed he has back pain from degenerative disc disease in his lumbar spine. (Tr. at 15, 263-284, 285-421, 424-425, 509-517.)[9] The ALJ noted Claimant "reports that his pain is constant and makes it difficult to climb, lift greater than 20 pounds, or work more than a couple hours at a time (Exhibit 3E)." (Tr. at 15, 198-205.)

After performing the two-step process[10], the ALJ determined that Claimant's allegations "credible to the extent that he has some limitations on lifting, carrying, walking, standing and sitting. However, the undersigned cannot find the claimant's allegations that he is incapable of all work activity to be credible." (Tr. at 15.) The ALJ found that the objective evidence of record supported the RFC. (Tr. at 15, 17.) The ALJ first noted Claimant's treating physician's records concerning Claimant's knee impairment, as described *supra*, and that in August 2013, Claimant

---

[9] It is noted that the majority of the records cited by the ALJ concern treatment notes from Parkersburg Orthopedic Associates, Cornerstone Healthcare, and Central Ohio Neurological Surgeons; these records span a period from August 2, 2010 to July 18, 2015.

[10] See, Craig v. Chater, 76 F.3d 585, 594 (4th Cir. 1996).

reported "feeling well" to his primary care provider, although he did not feel the steroid shots were very helpful, and that he continued to suffer from joint pain and stiffness, and a decreased range of motion with some crepitus documented. (Tr. at 15, 285-421.)

In his examination of the orthopedic records regarding Claimant's knees, the ALJ noted that Claimant's right knee pain persisted into September 2013 that became worse with activity. (Tr. at 15.) Although total knee arthroplasty was recommended, the ALJ noted there was no indication Claimant had the surgery, but also that "the record does not document any worsening of conditions or increase in care. In fact, the claimant's provider commended him on weight loss through exercise (Exhibit 7F)."[11] (Tr. at 15, 426-450.) Further, the ALJ noted that VA records also documented that Claimant "had no limitations in mobility and noted the claimant walked frequently (Exhibit 10F)."[12] (Tr. at 15, 468-508.) Finally, the ALJ acknowledged Claimant's testimony that "he had been in denial about his issues and lied to his physicians about his abilities, the objective findings indicate otherwise." (Tr. at 15.) Finally, the ALJ recognized that Claimant received no additional specialized treatment with respect to his knee and that the record contained no ongoing significant or objective findings. (Tr. at 15-16.)

With regard to Claimant's degenerative disc disease, the ALJ noted the May 2015[13] MRI revealed degenerative changes in his lumbar spine, with extensive facet arthritis, and moderate multi-level degenerative disc disease. (Tr. at 16, 424-425.) The ALJ also noted that Claimant sought treatment with a neurosurgeon in "early July 2015" due to numbness in his right leg and back pain, and that Claimant reported his right leg and back pain "resolved" by July 18, 2015 and

---

[11] The undersigned notes these office treatment records are dated from December 5, 2013 through February 23, 2015.
[12] The VA records are dated from March 20, 2014 to April 2, 2015.
[13] The record provides that the MRI is dated April 29, 2015.

was more concerned about pain in his scapula. (Tr. at 16, 509-517.) Again, the ALJ referenced Claimant's testimony that his pain resolved, but he still had "daily pain characterized as a 4-5/10 level." (Tr. at 16.) It was noted that Claimant also testified about left arm numbness that "came and went in a day." (Id.) The ALJ further acknowledged that "[d]espite this relatively quick improvement in symptoms, and documented normal motor sensory examination, the claimant was diagnosed with cervical radiculopathy." (Id.) Additionally, though Claimant testified that he would require a surgical intervention, the ALJ noted the neurosurgeon made no such specification, but "advised [Claimant] to continue on his steroids as prescribed and return in four months for follow-up." (Tr. at 16, 509-517.)

As pointed out by Claimant, the ALJ stated that he did not receive the type of medical treatment one expected of a totally disabled individual, although he did undergo right knee surgery; however, the ALJ found the surgery "to have been generally successful in controlling the claimant's pain and other symptoms (Exhibits 7F and 8F)." (Tr. at 16, 426-450, 451-454.) The ALJ found Claimant's compliance with his treatment supported his credibility, but did not find the extent of his treatment supported any greater limitations that those he assessed. (Tr. at 16.)

The ALJ next considered Claimant's Function Report, submitted when he was still working part-time at Lowe's, described *supra*, and from his statements therein determined that Claimant's impairments do not "result non-exertional limitations that would further erode the occupational base." (Id.) With respect to Claimant's work history, the ALJ found it "a significant favorable factor in assessing overall credibility and supports finding claimant unable to do work that is greater than sedentary in nature." (Id.)

The ALJ summarized his conclusion that Claimant's impairments were not as severe as

alleged because his activities of daily living, the conservative treatment regimen, and the lack of corroboration of objective evidence did not demonstrate a disabling condition. (<u>Id</u>.) Additionally, the ALJ noted that no treating or examining physician opined that Claimant was disabled or had greater limitations than assessed in the decision; the ALJ also stated "one might expect to see some indication in the treatment records of restrictions placed on the claimant by the treating doctor." (Tr. at 17.)

Claimant's credibility was not discounted entirely on the basis of the objective medical evidence of record, however, the undersigned cannot ignore that the medical records, including the statements Claimant made to his various providers do not support his allegations of disability. For instance, the ALJ's recognition of Claimant's ability to continue with exercises with his provider's blessing belies his allegations of disability precluding even sedentary work. (Tr. at 440, 462, 502.) It is also not lost on the undersigned that this evidence indicates that Claimant was able to be more active than alleged in March and May of 2014 and April 2015 – well over a year after the amended alleged onset date. Moreover, it is incongruous that Claimant's amended alleged onset date is nearly eight months before he quit working part-time at Lowe's.

In sum, the ALJ's pain and credibility analysis demonstrate compliance with the Regulations and is evident that he applied the factors promulgated under the pertinent Ruling. As a result, the ALJ's pain assessment and credibility determination are amenable to judicial review; accordingly, the undersigned **FINDS** substantial evidence supports the ALJ's findings and conclusion with respect to Claimant's pain and credibility.

<u>Physical Impairments and SSR 96-8p:</u>

Claimant also indicates that the ALJ failed to assess the affect his impairments has on his

ability to function "on a regular and continuing basis" as promulgated under SSR 96-8p.[14] (Document No. 9 at 11.) An RFC determination is based "on all the relevant evidence in [the] case record", which includes "relevant medical and other evidence" as well as "statements about what [the claimant] can still do", "descriptions and observations of [the claimant's] limitations . . . provided by [the claimant] . . . [.]" See 20 C.F.R. § 404.1545(a)(1), (a)(3). A medical opinion is not necessary in formulating a claimant's RFC, however, the Regulations and controlling case law are clear that the Commissioner is obligated to consider "all" the evidence in the record. Colvard v. Chater, 59 F.3d 165 (4th Cir. 1995) ("The determination of a claimant's [RFC] lies with the ALJ, not a physician, and is based upon all relevant evidence.")

Indeed, the ALJ noted the opinions from the State agency medical consultants, both of whom found Claimant was capable of light work, however, notably, the ALJ "has afforded the claimant the benefit of the doubt and assessed a residual functional capacity at sedentary exertion[.]" (Tr. at 17.)

As noted *supra*, the ALJ provided a detailed analysis of both the externally and internally conflicting evidence of record, as well as a discussion of the evidence justifying the RFC assessment. Further, despite Claimant's contention that the ALJ formulated his RFC assessment without considering his ability to engage in substantial gainful activity on a regular and continuing basis, eight hours per day and five days per week, it is clear from the record that this was simply not the case.

The ALJ explicitly found that

Although the claimant suffers from severe physical impairments that are significantly limiting, those limitations have been adequately assessed in the

---

[14] See "Policy Interpretation Ruling Titles II and XVI: Assessing Residual Functional Capacity in Initial Claims", SSR 96-8p, 1996 WL 374184, at *1-2.

residual functional capacity herein. Said limitations did not preclude all work. After assessing the claimant's description of past relevant work as an air traffic controller, the vocational expert identified that work as work performed at sedentary exertion. As such, though the undersigned finds the claimant's complaints regarding his impairments generally credible, the evidence in its entirety does not suggest any impairment or combination of impairments that would prohibit his past relevant work as an air traffic controller, as performed at sedentary exertion.

(Id.) In short, the ALJ herein provided ample evidence in support of the RFC assessment with respect to Claimant's impairments, and even gave him "the benefit of the doubt" by limiting him to sedentary work that not only "incorporates the limitations cited by DDS", but also considers the "most recent records support degenerative disc disease of the spine and reveal allegations of greater limitation (Exhibit 11F)." (Tr. at 17, 509-517.)

The ALJ supported his findings and conclusions by specific citations to the evidence of record, and are therefore supported by substantial evidence. See, generally, Richardson v. Perales, 402 U.S. 389, 390 (1971) ("The findings of the Secretary as to any fact, if supported by substantial evidence, shall be conclusive . . . ."); Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987). Additionally, the ALJ's written decision indicates that his explanations sufficiently meet the Fourth Circuit standard under Cook v. Heckler, 783 F.2d 1168 (4th Cir. 1986) and Hammond v. Heckler, 765 F.2d 424 (4th Cir. 1985).

Accordingly, the undersigned **FINDS** the ALJ's findings and conclusions related to his assessment of the RFC are supported by the substantial evidence. The undersigned further **FINDS** that in light of the ALJ's analysis of the evidence of record, the final decision denying Claimant's applications for benefits is "rational" and supported by the substantial evidence. Oppenheim, 495 F.2d at 397.

**Recommendations for Disposition**

For the reasons set forth above, it is hereby respectfully **PROPOSED** that the District Court confirm and accept the foregoing findings and **RECOMMENDED** that the District Court **DENY** the Claimant's request for judgment on the pleadings (Document No. 9.), **GRANT** the Defendant's request to affirm the final decision (Document No. 10.), **AFFIRM** the final decision of the Commissioner, and **DISMISS** this matter from the Court's docket.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED**, and a copy will be submitted to the Honorable John T. Copenhaver, Jr., United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and then three days (mailing/service) from the date of filing this Proposed Findings and Recommendation within which to file with the Clerk of this Court, specific written objections, identifying the portions of the Proposed Findings and Recommendation to which objection is made, and the basis of such objection. Extension of this time period may be granted for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. Snyder v. Ridenour, 889 F.2d 1363, 1366 (4th Cir. 1989); Thomas v. Arn, 474 U.S. 140, 155 106 S.Ct. 466, 475, 88 L.E.2d 435 (1985), reh'g denied, 474 U.S. 1111, 106 S.Ct. 899, 88 L.E.2d 933 (1986); Wright v. Collins, 766 F.2d 841 846 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91, 94 (4th Cir.), cert. denied, 467 U.S. 1208, 104 S.Ct. 2395, 81 L.E.2d 352 (1984). Copies of such objections shall be served on opposing parties, District Judge Copenhaver, and this Magistrate Judge.

The Clerk of this Court is directed to file this Proposed Findings and Recommendation and to send a copy of same to counsel of record.

ENTER: November 8, 2017.

Omar J. Aboulhosn
United States Magistrate Judge